UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
JESSE CARD,                              )
                                         )
                 Plaintiff,              )   Case No. C03-2385L
                                         )
         v.                              )
                                         )   ORDER GRANTING DEFENDANTS'
CITY OF EVERETT, *et al.*,               )   MOTION FOR SUMMARY
                                         )   JUDGMENT AND DENYING
                 Defendants.             )   PLAINTIFF'S MOTION FOR
_____)   SUMMARY JUDGMENT

This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. # 15 and 17. Plaintiff argues that defendants' display of a granite monument inscribed with the Ten Commandments (the "monument") violates the constitutions of the United States and the State of Washington. Defendants maintain that they have a valid secular purpose for preserving the monument and that, given the context in which it sits, no reasonable observer would view the monument as a governmental endorsement of religion. This case was stayed when the Supreme Court granted certiorari in American Civil Liberties Union v. McCreary County, 354 F.3d 438 (6th Cir. 2003), and Van Orden v. Perry, 351 F.3d 173 (5th Cir. 2003).   On June 27, 2005, the Supreme Court issued its rulings in both of those cases and the stay was lifted. The parties were invited to submit supplemental memoranda regarding the impact of Van Orden v. Perry, __ U.S. __, 125 S. Ct. 2854 (2005), and McCreary County v. American Civil Liberties Union, __ U.S. __, 125 S. Ct. 2722 (2005), on the pending cross-

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

motions for summary judgment.

Having reviewed the memoranda, declarations, and exhibits submitted by the parties, including the supplemental memoranda submitted on August 4, 2005, and having visited the City of Everett and viewed the monument at issue in this case, the Court finds as follows:

The average American who is not a constitutional scholar may reasonably be mystified by the two Ten Commandment opinions issued by a deeply divided United States Supreme Court on June 27, 2005. Even to those steeped in the long and rather contentious history of the Establishment Clause of the First Amendment, the Supreme Court's recent decisions may appear inconsistent, if not incompatible. Why, one might ask, is the display of a large, granite monument containing the Ten Commandments on the grounds of the Texas state capitol lawful while the same religious text, displayed as a printed, framed document in two Kentucky county courthouses violates the constitution? The text is virtually identical and each appears on public property where persons of all different faiths or no religious beliefs at all are exposed to its clearly Judeo-Christian message. The simple answer is one word: context. For Justice Breyer (the fifth majority vote in each case), the message that a display conveys must be evaluated in light of its historic, temporal, and physical setting. Because the context of the Texas and Kentucky displays varied, particularly in the length of time the Commandments had been on display without protest and the effect that the passage of time had on the message conveyed by the display, the outcome of the cases also varied.[1]

The context of the monument at issue in this case is remarkably similar to that

---

[1] Of course, to the other eight justices there was no legal difference between the two fact patterns: four (Justices Stevens, O'Connor, Souter, and Ginsburg) would have found both displays unconstitutional and four (Chief Justice Rehnquist and Justices Scalia, Kennedy, and Thomas) would have found both displays constitutional. For Justice Breyer, however, the history and context of the courthouse Ten Commandment displays in McCreary County "indicate[] a governmental effort substantially to promote religion, not simply an effort primarily to reflect, historically, the secular impact of a religiously inspired document." Van Orden, 125 S. Ct. at 2871.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT                -2-

presented to the Supreme Court in Van Orden. Having studied both McCreary County and Van Orden, the Court finds that the analysis and holding of Van Orden governs this case.

### FIRST AMENDMENT CLAIM

The Supreme Court has interpreted the constitutional mandate that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" to mean

> at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organization or groups and *vice versa*.

Everson v. Bd. of Educ. of Ewing, 330 U.S. 1, 15-16 (1947).[2] The Supreme Court has long

---

[2] In her concurring opinion in McCreary County, Justice O'Connor not only summarized the freedoms guaranteed by the First Amendment, but also wisely explained why enforcement of the Establishment Clause is vital to the health of our nation:

> Reasonable minds can disagree about how to apply the Religion Clauses in a given case. But the goal of the Clauses is clear: to carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society. By enforcing the Clauses, we have kept religion a matter for the individual conscience, not for the prosecutor or bureaucrat. At a time when we see around the world the violent consequences of the assumption of religious authority by government, Americans may count themselves fortunate: Our regard for constitutional boundaries has protected us from similar travails, while allowing private religious exercise to flourish. The well-known statement that "[w]e are a religious people" . . . has proved true. Americans attend their places of worship more often than do citizens of other developed nations . . . and describe religion as playing an especially important role in their lives . . . . Those who would renegotiate the boundaries between church and state must therefore answer a difficult question: Why

recognized, however, that not all religious displays violate the Constitution and that the Establishment Clause of the First Amendment does not allow, much less require, hostility toward religion or its symbols. As Justice Goldberg wrote in School Dist. of Abington Township v. Schempp, 374 U.S. 203, 308 (1963) (concurring), "[t]he First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercise or in the favoring of religion as to have meaningful and practical impact." In his concurring opinion in Van Orden, Justice Breyer recognized that such pragmatic considerations will undoubtedly give rise to difficult borderline cases, but concluded that the exercise of legal judgment based upon the facts of each case and a "consideration of the basic purposes of the First Amendment's Religion Clauses" is the best means of achieving the constitutionally mandated separation of church and state while avoiding mutual hostility. Van Orden, 125 S. Ct. at 2869, 2871.

        The monuments at issue in Van Orden and this case are virtually identical, having both been donated by the Fraternal Order of Eagles in an attempt to inspire young people and curb juvenile delinquency by providing children with a moral code of conduct to govern their actions. The Fraternal Order of Eagles is a well-respected organization[3] which, at the urging of a Minnesota juvenile court judge (Judge E.J. Ruegemer) and with the assistance of movie producer Cecil B. DeMille, agreed to distribute over a hundred of these granite monoliths to

---

> would we trade a system that has served us so well for one that has served others so poorly?

McCreary County, 125 S. Ct. at 2746.

[3] As noted by Justice Stevens in his dissent, the Fraternal Order of Eagles was formed in 1898 "by six Seattle theater owners, promptly joined by actors, playwrights, and stagehands, and rapidly expanded to include a nationwide membership numbering over a million." Van Orden, 125 S. Ct. at 2877 n.10.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT            -4-

state and local governments around the nation during the 1950s and 1960s. The monuments are tablet-shaped, stand approximately six feet tall, and prominently display the King James version of the Ten Commandments beneath secular imagery, such as a bald eagle and an American flag. The monument at issue in this case was donated by the Fraternal Order of Eagles and accepted by the City in December 1959. Other than the motion through which the City of Everett accepted this gift, there is no legislative record regarding this event. A newspaper article recounting the unveiling of the monument reports that a past grand president of the Fraternal Order of Eagles made the presentation to the City, that two local Eagles representatives performed the unveiling, that the mayor accepted the gift, and that a number of local church leaders participated in the presentation. Decl. of Michael K. Ryan (Dkt. # 22), at 7. It is not clear whether any of the local church leaders spoke at the presentation, but the Court will assume that the ceremony opened and/or closed with a prayer and that one or more of the clergy in attendance were called upon for remarks. See Second Decl. of Benjamin C. Block (Dkt. # 27), at 5-6.

The monument was originally placed at the northeast corner of what was then City Hall, where it sat until 1988 when it was moved approximately ten feet to the west to make way for three black monoliths commemorating City residents who died in the service of their country. The Ten Commandments monument now stands among trees and shrubbery approximately 43 feet to the right of the building entrance. In addition to the Ten Commandments monument, other monuments in the immediate area include the three War Memorial monoliths and a plaque commemorating the rededication of the building. There are also a number of statues/memorials on county property across the street.[4] Compared to the War Memorial that displaced it, the Ten Commandments monument enjoys limited visibility and,

---

[4] The county park includes a September 11, 2001, memorial, a monument to the common worker, a war memorial dedicated to county residents, a Medal of Honor memorial, and an Armed Forces monument.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT                -5-

unless the viewer stands in front of the monument, is partially or completely obscured by the surrounding shrubbery.[5] The War Memorial, which incorporates places to sit and is obviously designed to encourage contemplation, can be illuminated at night. The Ten Commandments monument, on the other hand, is unlit, has no viewing area, and presents a setting that is not conducive to reflection, much less religious observances.

Until 1990 when a citizen wrote a letter questioning the propriety of displaying the Ten Commandments on City property, the monument went unchallenged. In response to the 1990 inquiry, the City took the position that the Establishment Clause did not compel the removal of the monument, a position reiterated in response to the seven or eight complaints recorded after 1990. No legal challenge to the display was initiated until plaintiff filed this suit in 2003.

Because of the similarities between the cases, it is safe to say that this case, like Van Orden, is a "borderline case" under the First Amendment. 125 S. Ct. at 2869 (Breyer, J., concurring).[6] As the Supreme Court has recognized, the Ten Commandments are clearly religious -- "they were so viewed at their inception and so remain." 125 S. Ct. at 2863 (plurality decision). The religious nature of the text at issue does not resolve the constitutional question, however. The key to the Establishment Clause analysis is to determine the overall message

---

[5] In fact, although it is not readily apparent from the photographs presented by the parties, there is a wide planting strip between the public sidewalk and the handicap ramp that passes in front of the monument. Some of the plants in that strip are of considerable height and partially obscure the view of the monument even if one is standing directly in front of it on the sidewalk.

[6] Although the plurality's decision, written by Chief Justice Rehnquist, is relevant, Justice Breyer's concurring opinion guides this Court's analysis because, of the five Justices who voted to allow the continued display of the Texas monument, his opinion reflects the narrowest interpretation of the Establishment Clause. United States v. Antelope, 395 F.3d 1128, 1133 n.1 (9th Cir. 2005) (abiding by the rule that when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . .") (quoting Marks v. United States, 430 U.S. 188, 193 (1977)). Unless otherwise stated, citations to Van Orden are from Justice Breyer's concurrence.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT                -6-

conveyed by the text when examined in its setting as a whole. <u>Van Orden</u>, 125 S. Ct. at 2869. Thus, "we must examine how the text is used. And that inquiry requires us to consider the context of the display." <u>Van Orden</u>, 125 S. Ct. at 2869.

   The City of Everett's monument was donated by a private organization as part of a nationwide drive to "shape civic morality" and "combat juvenile delinquency." <u>Van Orden</u>, 125 S. Ct. at 2870. While the Fraternal Order of Eagles had a strong interest in the religious aspects of the Ten Commandments, the gift it offered to the City had a number of secular points in its favor: the monument provided a dramatic visual reminder of proper and, at the time, uncontroversial standards of social conduct, it was free, and it had ties to a recent Hollywood blockbuster movie, Mr. DeMille's "The Ten Commandments." The City's reasons for accepting the monument in 1959 are not in the legislative record -- it was accepted on a bare motion without comment or debate -- but there is no indication that the City either shared the donor's religious ideals or accepted the gift with an intent to proselytize. There were, in fact, many valid secular reasons for accepting such a grandiose gift from a well-respected community organization: a desire to reduce juvenile delinquency, to show appreciation for the organization's efforts, or even to obtain inexpensive works of art on a scale large enough to decorate public property are just three examples. The contemporaneous record does not suggest what the City's actual motivation was and the Court will not presume an unconstitutional motive on such limited and equivocal evidence.

   Plaintiff argues that the participation of clergy in the monument's unveiling ceremony indicates that an improper religious purpose prompted the City's actions. The record shows, however, that it was the Everett Aerie of Eagles that made the arrangements for the unveiling, including the selection of the speakers and participants. The City's contribution to the event was limited to the presence of Mayor Culmback, who simply accepted the monument on behalf of the citizens of Everett. Although it may be true that religion played a part in the

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT    -7-

Fraternal Order of Eagles' decision to donate these monuments (other motivating factors being Judge Ruegemer's desire to curb juvenile delinquency and Cecil B. DeMille's desire to promote his film), there is no indication that the City was motivated by religion when it accepted it. In fact, the monument "prominently acknowledge[s] that the Eagles donated the display, a factor which, though not sufficient, thereby further distances the [City] itself from the religious aspect of the Commandments' message." Van Orden, 125 S. Ct. at 2870.

The physical setting of the monument also supports a finding that the display was not intended to advance religion. The site not only "suggests little or nothing of the sacred" (Van Orden, 125 S. Ct. at 2870), it actually has an air of neglect or disregard. The monument was unceremoniously displaced in 1988 to make room for the City's War Memorial. Not only was it moved off its corner perch (where it made a striking figure facing the middle of the intersection), but the City opted to relocate it to a spot behind one of the three War Memorial monoliths and almost surrounded by trees and shrubs that significantly impair most views of the monument. Whereas the War Memorial is placed on a large, pie-shaped aggregate pad with decorative details and inset lights, the monument is sitting in the dark on a small pad of concrete that is partially covered by dirt. "The setting does not readily lend itself to meditation or any other religious activity." Van Orden, 125 S. Ct. at 2870. In fact, far from indicating a desire to promote Judeo-Christian theology, the current setting of the monument would suggest to a casual observer with knowledge of the monument's history that, when given the opportunity, the City purposely reduced the prominence of this overtly religious monument in favor of the more civic-minded War Memorial. Given the political realities that the monument was a gift from a respected civic organization and that the removal of the monument at this point in time would generate the type of religious divisiveness against which the Establishment Clause was meant to protect, the City's decision to relocate the monument to a less conspicuous place suggests a desire to avoid promoting a religious message.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT           -8-

The reference to the passage of time brings up a factor that Justice Breyer believed was "determinative" in <u>Van Orden</u> and which is equally applicable here. 125 S. Ct. at 2870. Justice Breyer found that the forty years between the time the monument was placed and plaintiff filed his legal challenge "suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significant detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion, to 'engage in' any 'religious practic[e],' to 'compel' any 'religious practic[e],' or to 'work deterrence' of any 'religious belief.'" <u>Van Orden</u>, 125 S. Ct. at 2870 (quoting <u>Schempp</u>, 374 U.S. at 306 (Goldberg, J., concurring)). The fact that the City's monument had stood uncontested, legally speaking, for forty-four years, "helps us understand that as a practical matter of degree this display is unlikely to prove divisive." <u>Van Orden</u>, 125 S. Ct. at 2871. In borderline cases such as this, where religious text is displayed in an historic and factual context that does not suggest an intent to advance religion, the passage of time not only confirms that the display poses no real threat to our religious freedoms, but it also materially alters the status quo in a way that must be considered by a reviewing court. Instead of seeking to prohibit the installation of an objectionable display or seeking to remove a display that only recently appeared on public property, plaintiff in this case is seeking to remove an object that was gifted to the City more than forty years ago and has become an expected and familiar part of the City landscape. To remove such aged displays would, as Justice Breyer noted, "lead the law to exhibit a hostility toward religion that has no place in our Establishment Clause traditions. Such a holding might well encourage disputes concerning the removal of longstanding depictions of the Ten Commandments from public buildings across the Nation. And it could thereby create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid." <u>Van</u>

Orden, 125 S. Ct. at 2871.[7]

Having considered the government's purpose in accepting and displaying the monument, the monument's history and location, and the community's reaction to the display, the Court finds that this display poses no real threat to freedom of religion and is therefore permissible under the Establishment Clause.

### ARTICLE I, SECTION 11 CLAIM

In addition to his First Amendment claim under the United States Constitution, plaintiff has asserted that the display of the monument on public property violates Article I, Section 11 of the Washington State Constitution, which states that "[n]o public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment . . . ." Under the state constitution, "the appropriation of money, or application of property, to effectuate any objective other than worship, exercise, instruction, or religious establishment is not within the prohibition." Malyon v. Pierce County, 131 Wn.2d 779, 799-800 (1997). As discussed above in the context of the First Amendment analysis, the display of the Ten Commandments monument was neither intended to, nor had as its primary effect, the facilitation of religious worship, exercise, or instruction. Because "a religious purpose is the key" under Article I, Section 11 (Malyon, 131 Wn.2d at 799), plaintiff's state law claim fails.

---

[7] The flip side of this argument is that an attempt to display the Ten Commandments on public property in today's multi-religious America would likely engender an immediate challenge from any one of the many persons who would perceive such a contemporary effort as a threat to his or her religious freedoms. See, e.g., Glassroth v. Moore, 335 F.3d 1282 (11th Cir. 2003). Such displays would be immediately divisive in part because the nation is no longer religiously homogeneous and in part because there would be no historical setting to mitigate the clearly religious message of the Ten Commandments.

Even some aged displays would likely run afoul of the Establishment Clause if the audience to whom the message is addressed is in some way captive or impressionable. For example, displays of the Ten Commandments on the grounds of a public school have been found unconstitutional because, "given the impressionability of the young, government must exercise particular care in separating church and state." Van Orden, 125 S. Ct. 2871. No such concerns are raised by the monument in this case.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT            -10-

For all of the foregoing reasons, plaintiff's motion for summary judgment is DENIED and defendants' motion for summary judgment is GRANTED. The display at issue here poses no threat to the religious freedoms of the citizens of Everett and its removal is not compelled by the First Amendment to the United States Constitution or Article I, Section 11 of the Washington State Constitution. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff.

DATED this 13th day of September, 2005.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT                    -11-